*Ex. 1*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CARI ANN HAMILTON

               Plaintiff,           Case No. 04-74993

vs.

                               Honorable Nancy G. Edmunds
                               Honorable Steven D. Pepe

PUBLICIS GROUPE SHORT TERM
DISABILITY PLAN and THE
HARTFORD FINANCIAL SERVICES
GROUP, INC.

               Defendants.

_____/

## REPORT AND RECOMMENDATION

Plaintiff's Complaint is comprised of two counts arising under the Employment Retirement Income Security Act (ERISA). Count I alleges that Defendants wrongfully denied her short-term disability (S-TD) benefits to which she was entitled. Count II alleges that Defendants refused to provide her with information regarding the S-TD Plan to which she was entitled to under ERISA.

All parties have filed motions for summary judgment which have been referred for a report and recommendation pursuant to 28 U.S.C. 636 (b)(1)(B). For the reasons stated below, IT IS RECOMMENDED that the Defendants' Motion (Dkt. #18 ) be DENIED and Plaintiff's Motion (Dkt. #19) be GRANTED IN PART AND DENIED IN PART with the following result: Plaintiff be awarded ST-D for August 30, 2004, through October 24, 2004, and $380 in statutory fees.

1

## I.    BACKGROUND FACTS

### A. Standard for Reviewable Facts

Congress passed ERISA to protect participants in employee benefit plans by requiring

employee plans to meet minimum standards and allowing for judicial review in federal courts. 29

U.S.C. §1001(b). Section 1132(a) allows a participant to file suit in federal court to enforce the

terms of their ERISA-covered employee benefit plan. In claims without a procedural challenge to

the administrator's decision, the Sixth Circuit has limited judicial review to "evidentiary materials

contained in the administrative record." *Wilkins v. Baptist Healthcare Sys., Inc.,* 150 F.3d 609, 619

(6th Cir. 1998) (Gilman, J., concurring) (citing *Perry v. Simplicity Engineering,* 900 F.2d 963, 966

(6th Cir. 1990)). The limitation of judicial review to the administrative record is to effectuate

Congress's intent in drafting ERISA which was to create a mechanism for disposition which "does

not neatly fit under either Rule 52 [Bench Trial] or Rule 56 [Summary Judgment]." *Wilkins,* 150

F.3d at 619.

Plaintiff's procedural challenge to the Defendants' decision was dismissed by order of this

Court on November 10, 2005 (Dkt. #17). Therefore, because Plaintiff's remaining challenges regard

her entitlement to benefits under the S-TD Plan pursuant to the Plan's own language and alleging

that Defendants interfered with her ERISA rights, the Court's review of this matter is limited to the

Administrative Record.

Yet, with regard to Count II, both Plaintiff and Defendants made allegations regarding the

timing of Plaintiff's requests for and Defendants' submission of ST-D documentation that were not

supported by the administrative record. Both parties also made allegations in their motions and

responsive pleadings that appeared to contradict their initial pleadings. Therefore, in order to

2

provide the Court with a recommendation on Count II, a telephonic hearing was held on August 14, 2006.

At this August 14 hearing it was determined that the only existing documentation not included in the administrative record was a November 15, 2004, letter sent by Plaintiff to Defendant Publicis requesting the ST-D Plan. A letter which Defendant's admit to receiving in their Answer (¶ 33). The parties agreed that this letter would be submitted to the undersigned for consideration as a supplement to the record, but that Judge Edmunds would make the final determination regarding whether this letter would be accepted as a supplement to the record.[1]

### B. Reviewable Facts

Since January 2002, Plaintiff has been employed by Leo Burnett USA, a wholly-owned subsidiary of Publicis Groupe (R. 33; Answer, ¶¶ 1, 5). As a benefit of employment Plaintiff received S-TD insurance coverage. Defendant Hartford Financial Services Group (Hartford) is the delegated claims administrator with full discretionary authority to make decisions relating to the Plan

---

[1]In *Wilkins v. Baptist Healthcare Sys., Inc.,* 150 F.3d 609 (6th Cir. 1998), the Sixth Circuit clarified the permissible scope of discovery in an ERISA action in federal district court. 150 F.3d at 618-19. The Court instructed district courts to follow a two-step process in adjudicating an ERISA benefit action:

> 1. As to the merits of the action, the district court should conduct a de novo review based solely upon the administrative record, and render findings of fact and conclusions of law accordingly. The district court may consider the parties' arguments concerning the proper analysis of the evidentiary materials contained in the administrative record, but may not admit or consider any evidence not presented to the administrator.
>
> 2. The district court may consider evidence outside of the administrative record only if that evidence is offered in support of a procedural challenge to the administrator's decision, such as an alleged lack of due process afforded by the administrator or alleged bias on its part. This also means that any prehearing discovery at the district court level should be limited to such procedural challenges.

*Id.*

3

(R. 23).

During the relevant time period, 2004, S-TD was available to provide Plaintiff with a portion of her salary for a maximum of 180 days, after a 7 day elimination period, if a disability occurred while she was actively at work and continued to meet the definition of short-term disability (R. 9). Disability was defined by the S-TD Plan as an illness or injury involving a physical or mental impairment that caused an inability to "perform the material and substantial duties" of one's "regular occupation" (R. 13).[2]

On August 2, 2004, Plaintiff submitted an application for S-TD beginning July 29, 2004 (R. 33). Notes from a conversation between Defendant Hartford and Plaintiff indicate that Plaintiff complained of pain in both breasts and enlarged lymph nodes, surgery had been recommended but was not covered by her insurance and she had an estimated return to work date of September 1, 2004, upon satisfactory re-evaluation (R. 55). This claim was denied by Defendant Hartford on August 26, 2004 (R. 73).

Hartford explained its decision saying that it had reviewed Plaintiff's medical records and spoke with Plaintiff's primary care physician, Dr. John Pradko, D.O., and determined that, although Plaintiff may experience pain due to her condition, there was no evidence of a functional impairment that would preclude her from performing her job (R. 74), which consisted of sitting at a desk to work on a computer and telephone (R. 110). Notes from Hartford's August 23, 2004, conversation with Dr. Pradko indicate that he refused to comment on Plaintiff's ability to perform her job and stated

---

[2] "Material and substantial duties" is defined as "the necessary functions of your regular occupation which can't be reasonably omitted or altered" and "regular occupation" is defined as the "occupation that you perform for income or wages on the day of your disability. . . . not limited to the specific position you hold at the Company" (R. 31).

4

that this issue was up to Hartford and Plaintiff's employer to determine (R. 52).

In a September 14, 2004, letter requesting an appeal of the denial of her claim, Plaintiff described her medical history (R. 224-225). She explained that she had been diagnosed with dense heterogeneous fibroglandular tissue, fibroadenoma and adenosis in her breasts and described pain that had escalated to unbearable levels (R. 224). She described that pain as extreme in all but 3-5 days each month at which time it was a dull constant ache. The pain radiated into her arms, hands and back and when her breasts swelled they caused lymph nodes under her arms to swell causing discomfort in her neck and shoulders. She was unable to lift her arms past her shoulders, grip or hold anything heavy than a gallon of milk or sleep through the night. She slept only 3-4 hours each night and had to be in an upright position. She found it difficult to comb her hair, apply makeup or dress herself. Ibuprofen that had been prescribed caused sickness and fatigue. A Duragesic pain patch made her dizzy and caused insomnia. In mid-July she was prescribed Vicodin, which was switched to Oxycontin when it did not alleviate the pain. Oxycontin alleviated a "fair amount" of the pain but left her dizzy, nauseous, confused, unbalanced and tired. She also felt her health was affected by the extreme stress and worry she felt due to chronic pain, impending surgery, medical bills and possible job loss. She had been prescribed an anti-anxiety medication (R. 225). Her medications diminished her hand-eye coordination, cognition and reaction time; made her forgetful and prevented her from driving a car. Plaintiff also indicated that her husband had to assist her with typing her correspondence because physically holding her arms in the position to type would be painful and difficult.

The administrative record contains treatment notes from Dr. Pradko and further letters from treators:

5

On January 19, 2004, Dr. Pradko's records indicate that Plaintiff sought a second opinion regarding her fibroid tumors in breasts (R. 254). In a February 12, 2004, letter to Dr. Pradko, Dr. Stephen Cahill, D.O. indicated that Plaintiff had reported experiencing breast pain since her early 20s when she began birth control pills (R. 239-40). She was taking Excedrin on an as needed basis. Physical examination revealed tender glandular tissue in both breasts upon palpation, minimal ptosis, no palpable discrete breast mass and right axilla lymphadenopathy (R. 240). Dr. Cahill diagnosed severe bilateral breast pain with an uncertain etiology and recommended a follow-up visit in 2-3 weeks after a review of Plaintiff's previous biopsy results, hormone studies and any updated mammograms or ultrasounds.

On March 11, 2004, Plaintiff reported that she was very upset with Dr. Cahill and would seek a second opinion from Dr. Isabelle Audet, M.D. (R. 243).

In a March 18, 2004, letter to Dr. Audet, Dr. M. Kayser, M.D. indicated that Plaintiff reported pain in her breasts that was resolved only during her menstrual cycle and changes in volume symmetry (R. 237). Plaintiff indicated she wished to proceed with bilateral mastectomies and immediate reconstruction. Physical examination revealed volume discrepancy, Grade 1 ptosis (drooping or lowering), a 4-5 centimeter mass in the upper outer quadrant of each breast (consistent with dense breast tissue) and no adenopathy.

On May 2, 2004, Dr. Audet wrote a letter supporting bilateral mastectomies as medically necessary and stating that Plaintiff had experienced significant breast problems since 2000 (R. 273). She further stated that a November 9, 2000, mammogram had revealed dense heterogenous fibroglandular tissue throughout both breasts. Plaintiff had reported that between that time and October 2003 the mass enlarged and persisted in being painful. At that time Dr. Audet repeated the

6

mammogram, finding no changes, and an ultrasound, which was negative. She took a biopsy of the mass to rule out malignancy and provide symptom relief. The breast pain then worsened over the next 2-3 months. Plaintiff reported debilitating pain affecting her daily life and an inability to reach over her head, lift heavy objects or have anything lean on her chest and further stated that driving a car caused her discomfort. Dr. Audet explained that Plaintiff wanted bilateral mastectomies because of her "severe symptomology, increased risk of breast cancer with adenosis and decreased sensitivity of mammogram with her dense breast tissue".

A June 24, 2004, letter from Dr. Pradko indicates that Plaintiff sought bilateral mastectomies for her history of breast pain. He indicated that diet and lifestyle changes as well as use of Duragesic patches had not helped. On July 14, 2004, Plaintiff was reportedly crying and upset about insurance failure and reported needing pain medication (R. 256). It is noted that Ibuprofen, Duragesic patch and Vicoden had previously failed. On July 29, 2004, Plaintiff was crying uncontrollably and upset with lack of pain relief and increased sleepiness from Vicodin and Provera (R. 259). She reported being a wreck physically and emotionally and unable to concentrate to do her job. Dr. Pradko discontinued Vicodin and indicated that Plaintiff would change prescription pain medication. On August 13, 2004, Plaintiff visited Dr. Pradko to follow up paperwork regarding her lawsuit (R. 247). Plaintiff indicated that Oxycontin was able to control her pain but made her "sleepy".

To her appeal letter she attached the following information from her treators:

(a.) A September 2, 2004, letter from Dr. Pradko indicating that he had last examined Plaintiff on August 30, 2004, and she had continued to experience painful breasts with palpable mass effect changes in the upper outer quadrants (R. 226). She displayed painful range of motion in her arms and complained of weakness and sensory defect. Upon examination Dr. Pradko found

7

diminished finger sensation. He recommended an EMG, bilateral mammogram and ultrasound because of her upper extremity complaints and the fact that he had no new breast films. He noted that Oxycontin caused nausea and dizziness with sedation. He opined that she was "disabled from work due to her loss of mental function and retractable pain along with loss of upper extremity function".

(b.) A September 11, 2004, letter from Dr. Audet (which was apparently misdated August 11, see R. 223) indicates Plaintiff had been a patient since 2002 when she was treated with an excisional biopsy for an enlarging right breast mass (R. 227). Dr. Audet opined that Plaintiff's bilateral breast pain was secondary to her fibrocystic tissue and adenosis and could not be shown with objective findings because it was entirely subjective. She opined that Plaintiff was required to use narcotic pain management until surgery could be performed and that the narcotics "can affect the sensorium and prevent one from performing their job, or daily activities properly (such as driving a car)" and that "[f]rom [Plaintiff's] description of her job, she is unable to work while taking narcotics. In fact, she is unable to drive herself to work".

On September 30, 2004, Hartford's Appeals Team informed Plaintiff that her appeal had been referred to a Medical Consultant (R. 66). The Medical Consultant, Dr. Olaf Anderson, M.S., M.D., F.A.C.S., reviewed Plaintiff's medical records and spoke with her treators, Drs. Pradko, Kayser and Cahill (through his nurse) (R. 136, 139, 141, 143).

On October 4, 2004, Plaintiff's health insurance company, Blue Cross Blue Shield (BCBS) reversed the previous denial of Plaintiff's request for coverage of bilateral mastectomies (R. 175). Plaintiff faxed the approval letter to Hartford on October 6, 2004.

On October 14, 2004, Dr. Anderson summarized his record review as follows:

8

Pain and tenderness from bilateral fibrocystic disease of her breasts have troubled the claimant since her early 20s when she first started birth control pills. Over the years she has tried numerous conservative remedies for pain including different birth control formulations, reduced caffeine and fat intake, multiple B-Complex and other vitamins, anti-inflammatories and eventually analgesics Vicodin and Oxycontin as well as Zanax, an[ ] anti-anxiety medication. She has undergone numerous mammograms and breast ultrasounds always demonstrating dense fibroglandular tissue. On 10.24.03 she underwent excision of a tender fibrocystic mass in the upper, outer right breast with temporary relief of her symptoms. Both mass and symptoms, however, rapidly recurred as well as a similar mass in the left upper, outer breast. At this time she has severe bilateral fibrocystic changes, right greater than left, with extension into both axillary regions. . . . .

Detailed hormonal evaluations suggest there is no abnormal hormonal cause for her breast pain. Her mother had fibrocystic disease.

Over the past five months the pain has reached, according to claimant, excruciating levels to the point she is experiencing pain even on moving her arms. She [complained of] weakness and parasthesias with arm extension and abduction and sleeps only 3-4 hours nightly in an upright sitting position. She therefore stopped work in 7/29/04 being unable to concentrate on her work not only because of pain but also feeling cognitively impaired from analgesics she takes twice a day.

She has consulted her primary care physician, two general surgeons, a plastic surgeon and an endocrinologist. On 10.4.04 she was informed by BCBS of Illinois that her much sought after operation (bilateral subcutaneous mastectomies with immediate reconstruction consisting of issue expansion and subsequent placement of permanent implants) had been approved, thus reversing the previous denial.

(R. 135-36).

Dr. Anderson stated that in his conversation with Dr. Pradko, Dr. Pradko, though he had written on September 2, 2004, that Plaintiff was disabled from work due to her loss of mental function and breast pain, opined that Plaintiff could perform some work on a computer and speak on a telephone (R. 136). Dr. Anderson also indicated that it was "pointed out that she had readily managed to write numerous, lengthy detailed letters appealing her short-term disability status and

need for an operation" (R. 136-47).[3]  Dr. Pradko had concluded that Plaintiff was a "perfectionist feeling unable to perform her work on a background of severe subjective pain and the occasional use of a narcotic analgesic" (R. 137).

Dr. Anderson noted that (a.) while Dr. Audet, on August 11, 2004,[4] wrote that Plaintiff was unable to work while taking narcotics, Dr. Cahill, whom Plaintiff had last seen on February 12, 2004, found no grounds for any work restrictions (R. 137), (b.) Dr. Kayser felt that Plaintiff could work on a computer and talk on the telephone for eight hours and perform overhead lifting 10-15% of that time (R. 143)[5] and (c.) there was no objective evidence of Plaintiff's arm complaints "no orthopedic or neurological evaluation, no EMG or cervical MRI. . . . no record of referral for pain management or a psychological evaluation" (R. 137).

Dr. Anderson concluded that Plaintiff could perform sedentary work with a sit/stand option and could perform overhead lifting 10-15% of her work-day with discomfort, and opined that her present level of pain would be expected to continue until she had an operation or possibly until she

---

[3]Plaintiff argues that this statement indicates that Dr. Anderson "pointed out" to Dr. Pradko that Plaintiff had typed her own appeals, which she argues was contradicted by her September 14th appeal letter in which she stated that her husband had to type for her because she it was too painful for her (R. 225). Yet, the statement does not indicate whether Dr. Pradko or Dr. Anderson was the one who pointed out Plaintiff's abilities, and does not actually say whether this was used to determine whether she could type or that she had control of her mental faculties. Her appeal letter only indicates that her husband had assisted with typing due to physical considerations.

[4]Dr. Anderson is apparently referring to the letter that was misdated August 11, 2004, and should have been dated September 11 as indicated by Plaintiff (R. 223).

[5]Dr. Kayser is a plastic surgeon to whom Dr. Audet referred Plaintiff for a March 18, 2004, consultation regarding bilateral mastectomy and breast reconstruction (R. 267). In a letter to Dr. Kayser summarizing their conversation, Dr. Anderson stated that Dr. Kayser had told Plaintiff that he did not think surgery was indicated for her and recommended a psychological and pain management evaluation (R. 143).

10

became pregnant (R. 137-38).

Hartford denied Plaintiff's appeal in an October 18, 2004, letter (R. 145). Hartford indicated that it had agreed with the original claim team's findings on its own review, but had referred the matter to Dr. Anderson for a medical record review. Hartford explained that it was relying on the information provided by her physicians and Dr. Anderson, was not disputing Plaintiff's diagnosis of fibrocystic breast disease, but felt she could still perform her occupation despite the pain and discomfort reported to her physicians (R. 146).

Plaintiff underwent the bilateral mastectomies on October 25, 2004, and Dr. H. Houin recommended that she not return to work until November 17, 2004, and return with a restriction of no lifting over 10 pounds until December 6, 2004 (R. 275). On November 10, 2004, Hartford approved Plaintiff's S-TD claim for the period following this surgery (R. 276). After the S-TD Plan's 7 day elimination period, this entitled Plaintiff to benefits from November 1, 2004, through her return to work.

On November 15, 2004, Plaintiff wrote a letter to Defendant Publicis requesting a copy of the ST-D Plan (Exhibit 1, *see* Complaint and Answer ¶33). On December 12, 2004, Plaintiff filed the present lawsuit seeking benefits from July 29, 2004, through October 24, 2004 (Dkt. #19, p. 5).

## II.   LEGAL ANALYSIS

### A.   Standard for Judicial Review of Plan Administrator's Actions

A Court will review the Plan Administrator's decision *de novo* unless "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). When there is a "clear grant of discretion to the administrator," courts defer to the Administrator's

11

decision, reviewing it only to see if it was arbitrary and capricious. *Miller v. Metropolitan Life Ins. Co.*, 925 F.2d 979, 984 (6th Cir. 1991); *Brown v. Ampco-Pittsburgh Corp.*, 876 F.2d 546, 550 (6th Cir. 1989).

In the present matter, the parties agree that the Plan grants discretion to the plan administrator and the claims administrator, Hartford, and that the arbitrary and capricious standard is appropriate (Dkt. #19, p.14; #18, p. 5). Indeed, the Plan provides the plan administrator with "complete discretionary authority to make all determinations under the Plan, including eligibility for benefits and factual determinations, and to interpret the terms and provisions of the Plan" (R. 23). The Plan further indicates that the plan administrator delegated to the claims administrator the "discretionary authority to make decisions regarding the interpretation or application of Plan Provisions, to make determinations (including factual determinations) as to the right and benefits of employees and participants under the Plan, to make claims determinations under the Plan, and to decide the appeal of denied claims".

"[T]he arbitrary and capricious standard is the least demanding form of judicial review of administrative action. When applying the arbitrary and capricious standard, the Court must decide whether the plan administrator's decision was rational in light of the plan's provisions. Stated differently, when it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Williams v. International Paper Co.*, 227 F.3d 706, 712 (6th Cir.2000)(internal citations and quotations omitted).

Further, "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'factor [ ] in determining whether there is an abuse of discretion.'" *Bruch*, 109 S.Ct. at 956-57 (citation omitted).

12

A potential conflict of interest is only a factor to consider in a review and does not alter the arbitrary and capricious standard of review. *Smith v. Continental Cas. Co.*, 450 F.3d 253, 260 (6th Cir. 2006). In order for a conflict to be considered, "there must be significant evidence in the record that the insurer was motivated by self-interest and the plaintiff bears the burden to show that a significant conflict was present." *Id.*

**B.**   **ANALYSIS**

    **1.**   **Alleged Conflicts of Interest**

As stated above, a potential conflict of interest is only a factor to consider in a review and does not alter the arbitrary and capricious standard of review. And, in order for Plaintiff's allegation of a conflict to even be considered she was required to meet the burden of showing that a conflict was present – "there must be significant evidence in the record that the insurer was motivated by self-interest". *Id.*

In an earlier motion Plaintiff presented a procedural challenge which, among other things, alleged that Hartford had operated under a conflict of interest (Dkt. #11). This challenge and the accompanying request to conduct discovery was denied by Judge Edmunds in November 2005 (Dkt. #17).

    ***a.***   ***Hartford***

Notwithstanding the fact that Plaintiff was not allowed to conduct discovery in this matter, Plaintiff did not develop the record to show that a conflict of interest contributed to an arbitrary and capricious determination by Hartford – in fact, Plaintiff simply alleged that Hartford must be laboring under a conflict of interest due to the fact that Publicis contracted with Hartford to administer its employee benefits. Yet, even if Publicis had made its own claims decisions this fact

alone would not be enough to imply a conflict of interest.[6]  And, there is no evidence in the record to support Plaintiff's contention that Publicis makes an initial benefits decision and Hartford's role is to "cobble together a professional opinion presenting the best possible argument for denying benefits" (Dkt. #19, p. 22).

Plaintiff claims that the approval letter that accompanied her eventual approval for S-TD is proof that Public makes the initial S-TD determination because it indicates that her claim was approved "for payment as directed by your employer" (Letter, Dkt. #276).  This letter does not appear to indicate that Publicis is responsible making initial benefits determinations, but appears to indicate that payment will be made in a manner directed by Publicis.  If Pubicis had made the determination, why would the letter not come from Publicis?  Further, even if Publicis had made the determination that Plaintiff was to receive benefits due to her bilateral mastectomies, this is scant

---

[6]

It is now settled that " 'there is an actual, readily apparent conflict . . . , not a mere potential for one,' when the company or plan administrator is the insurer that ultimately pays the benefits." *Gismondi v. United Techs. Corp.*, 408 F.3d 295, 299 (6th Cir. 2005) (alteration in original) (quoting *Killian v. Healthsource Provident Adm'rs*, 152 F.3d 514, 521 (6th Cir.1998). But if the conflict of interest did not actually motivate [the administrator's ] decision, then it is given no weight as a factor in determining whether the decision was arbitrary and capricious. *See Hockin v. Kmart Corp. Long Term Disability Income Plan*, 105 Fed. Appx. 755, 757 (6th Cir.2004) ("[W]here a 'review of the record reveals no significant evidence that [the administrator] based its determination on the costs associated with [the claimant's] treatment or otherwise acted in bad faith, we cannot conclude that [the administrator] was motivated by self-interest." ') (third alteration in original) (citing *Peruzzi*, 137 F.3d at 433).

*Pflaum v. UNUM Provident Corp.*, 2006 WL 678960, *3 (6th Cir. 2006).

evidence that Hartford operates under a conflict of interest when it receives claims for processing.[7]

Yet, Hartford's failure during the appeal of its initial decision to ask the medical consultant, Dr. Anderson, to contact Dr. Audet, with whom Plaintiff had had her most recent surgery consultation, in formulating his opinion and failure to mention this opinion in either the denial letter or the appeal denial letter is unexplained. This omission begs the question, "why only omit one doctor?".

*Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003), held that "[C]ourts [may not] impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." But, this opinion does not stand for the proposition that an administrator may ignore a claimant's credible evidence. *See Nord*, 538 U.S. at 834 ("Plan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician."); *cited in, Kalish v. Liberty Mutual/Liberty Life Assur. Co. of Boston*, 419 F.3d 501, 510 (6th Cir. 2005).

Therefore, while there is not sufficient evidence in the record to support the contention that Hartford was operating under a conflict of interest, Hartford's failure to request that Dr. Anderson contact Dr. Audet or discuss Dr. Audet's opinions in its analysis of Plaintiff's claim should be considered when deciding whether its decision was arbitrary and capricious – this omission is not enough to meet Plaintiff's burden of showing that there was a conflict of interest.

---

[7]Plaintiff also alleges that Publicis denied her benefits claim and referred it to Hartford when she originally filed (Dkt. #19, p.6). Yet, there is nothing in the record to indicate that Publicis made an initial determination. The record does indicate that Plaintiff last worked on Wednesday, July 28, 2004, provided notice of her claim for S-TD on Monday, August 2nd (R. 33), visited Dr. Pradko on July 29th (R. 259) and spoke to Hartford about how to submit a group authorization form on Wednesday, August 4, 2004 (R. 56).

### b.    Medical Consultant, Dr. Anderson

Plaintiff argues that Dr. Anderson was operating under a conflict of interest because he was chosen by Hartford and "would have to be incredibly naive to think that he could regularly disagree with The Hartford and continue to receive The Hartford's business" (Dkt. # 19, p. 20).

> The Supreme Court has expressly held that courts reviewing ERISA appeals should not automatically assume that a physician's testimony is subject to a conflict of interest. *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 834, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003) ("[C]ourts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation."). In so holding, the Supreme Court noted that "the assumption that the opinions of a treating physician warrant greater credit than the opinions of plan consultants may make scant sense" because treating physicians may have a countervailing incentive to find patients disabled. *Id.* at 832.

*Reznick v. Provident Life and Acc. Ins. Co.*, 2006 WL 1342361, *4 (6th Cir. 2006).

In support of her claim that Dr. Anderson was not impartial, Plaintiff argues that Dr. Anderson was on "a mission" to create evidence to support the denial of her claim, failed to contact Dr. Audet and made the false representation to Dr. Pradko that she had typed her appeal paperwork herself even though she had indicated to Hartford that her husband typed it for her.

As Plaintiff points out in her brief, the referral form sent to Dr. Anderson from Hartford did not list Dr. Audet as a doctor to be contacted (R. 172). Further, Dr. Anderson did mention Dr. Audet's findings in his report on the review of Plaintiff's medical records – he states that she consulted with 2 general surgeons (R. 136) and that Dr. Audet found her " 'unable to work while taking narcotics' " while Dr. Kayser found no grounds for any work limitation (R. 137).

There is no requirement that a medical consultant contact any, much less all, of the claimant's medical sources in formulating an opinion. *Calvert v. Firstar Finance, Inc.*, 409 F.3d 286, 295 (6th

16

Cir. 2005) ("reliance on a file review does not, standing alone, require the conclusion that [an administrator] acted improperly").

Further, Dr. Audet had treated the claimant recently and the file contained a recent opinion about the claimant's ability to work that Dr. Anderson could rely upon. There is no requirement that special weight be given to the opinions of claimant's physicians, much less one treator over another where, as here, a claimant has multiple treators and only some have indicated that her condition is disabling. *Nord, supra*, 538 U.S. at 834. And, it must be noted that the record does not contain any treatment notes from Dr. Audet, only 3 letters opining about Plaintiff's condition, of which only the last indicates that she is disabled from work. Therefore, Dr. Anderson's failure to contact Dr. Audet cannot support a claim of impartiality.

The comment in Dr. Anderson's report that during his conversation with Dr. Pradko it was pointed out that Plaintiff had completed her own appeals paperwork, even if taken to mean that Dr. Anderson pointed this out as opposed to Dr. Pradko, is not sufficient to support a finding of impartiality. Even though Plaintiff informed Hartford in a September 20, 2004, letter that she was not able to type her appeals paperwork herself due to her physical impairment (R. 225), there is no indication that Dr. Anderson did not simply error in not noticing this comment. Further, there does not appear to be any documentation of Plaintiff complaining of an inability to type or talk on the telephone in her medical records.

Dr. Audet on May 2, 2004, indicated that Plaintiff's October 2003 mammogram showed no changes from a November 9, 2000, study, an ultrasound of her breasts was negative, upper extremity complaints were related to overhead and heavy lifting and, at times, driving a car (R. 273). On September 11, 2004, Dr. Audet indicated that she could not explain Plaintiff's upper extremity

17

complaints as being related to her breast pain, suggested they might be caused by posture adopted to accommodate breast pain (R. 171) and indicated that, from Plaintiff's description of her job, narcotic use would prevent her from working (R. 227).[8]  Dr. Pradko's September 2, 2004, letter indicated that during an August 30th exam Plaintiff complained of painful range of motion and weakness in her arms and he noted a diminished sensation in her fingers (R. 226).  Dr. Pradko recommended that she submit to an EMG, bilateral mammogram and bilateral breast ultrasound (R. 226) – but, as Dr. Anderson pointed out, there is no record of these or other upper extremity studies having been completed.

With no support for Plaintiff's inability to type or talk on the telephone contained in the record, other than Plaintiff's own appeal letter, the comment regarding Plaintiff's ability to type her own disability paperwork, regardless if made by Dr. Pradko or Dr. Anderson, should not serve as the sole support for a claim that he was biased against Plaintiff.

**2.    Was Denial of Benefits Arbitrary and Capricious**

The Sixth Circuit in *Kalish v. Liberty Mutual/Liberty Life Assur. Co. of Boston*, 419 F.3d 501, 510 (6th Cir. 2005), acknowledged the general rule that " ' when a plan administrator chooses to rely upon the medical opinion of one doctor over that of another in determining whether a claimant is entitled to ERISA benefits, the plan administrator's decision cannot be said to have been arbitrary and capricious' ".  *Id.*  But, the Court went to say that where an administrator relies exclusively on the independent file review of a doctor whose "report is inadequate in several crucial respects", this may be considered arbitrary and capricious.  *Id.*

---

[8]This second letter is dated August 11, but Plaintiff explained to Hartford that this was a typographical error (R. 223).

As stated above, Plaintiff argues that Dr. Anderson's report was inadequate in that he failed to contact Dr. Audet or properly evaluate her opinion and relied on Dr. Pradko's statement that she could do some computer work and talk on the telephone, where this comment was elicited by the false statement that she had typed her own disability paperwork.

These arguments fail for the same reasons articulated for denying Plaintiff's claim that Dr. Anderson should be considered biased against her. Further, Hartford explained in its denial letter that Dr. Anderson's opinion was not dispositive, but merely supportive of its decision to deny Plaintiff ST-D (R. 59). In fact, Hartford indicated that it submitted the appeal to Dr. Anderson even though it "agreed with the claim teams' findings".

There is evidence in the record to support a decision that Plaintiff, although afflicted with painful fibrocystic breasts, was *physically* capable of doing her job with certain accommodations. The only contrary opinions were formulated by Drs. Audet and Pradko after the denial of Plaintiff's initial ST-D claim, and these opinions centered solely around Plaintiff's subjective complaints. Dr. Audet indicated that plaintiff's objective tests had not changed from October 2004 to May 2005 and that her upper extremity complaints (a.) were not explainable by her breast pain and (b.) were reported to involve the inability to lift overhead or lift heavy objects – not type or talk on the telephone as her job required. Dr. Pradko asked Plaintiff to submit to additional tests, the results of which are not contained in the record. Drs. Kayser and Cahill determined that Plaintiff was physically able to do her job and, because there is no evidence in the record other than Plaintiff's subjective complaints of pain, that Plaintiff's physical condition changed from February and March when Drs. Cahill and Kayser saw her to August when Drs. Pradko and Audet labeled her disabled from work, it appears that Hartford's decision regarding Plaintiff's physical ability to complete her

19

work was not arbitrary nor capricious.

The effect of Plaintiff's use of narcotic pain relievers on her ability to do her job, however, is not really addressed by Hartford, nor Dr. Anderson. Dr. Anderson explains that Plaintiff stopped work because she felt she was cognitively impaired from analgesics and he acknowledges that in September 2005 Drs. Pradko and Audet indicated that she could not work due to her loss of mental function and use of narcotic pain relievers, but then he fails to analyze her ability to work in this context, concentrating instead on the lack of evidence to support a disabling physical impairment (R. 136-137). Dr. Anderson does note the lack of referral for pain management or psychological evaluation, but does not address why the opinions of Drs. Audet and Pradko, that Plaintiff could not work while taking narcotic pain relievers, were ignored. This is especially concerning given that the other doctors, Drs. Cahill and Kayser, gave opinions about Plaintiff's ability to work that were based on evaluations of Plaintiff that took place in February and March 2004, before Plaintiff began to take narcotic pain relievers in June or July 2004.

> The remedy when an ERISA administrator fails to make adequate findings or to explain adequately the grounds of her decision is to remand the case to the administrator for further findings or explanation. *See Gallo v. Amoco Corp.*, 102 F.3d 918, 923 (7th Cir.1996); *see also Counts v. Am. Gen. Life & Accident Ins. Co.*, 111 F.3d 105, 108 (11th Cir.1997); *Weaver v. Phoenix Home Life Mut. Ins. Co.*, 990 F.2d 154, 159 (4th Cir.1993). A remand for further action is unnecessary only if the evidence clearly shows that the administrator's actions were arbitrary and capricious, *Weaver*, 990 F.2d at 159, or "the case is so clear cut that it would be unreasonable for the plan administrator to deny the application for benefits on any ground." *Gallo*, 102 F.3d at 923 (citing *Weaver*, 990 F.2d at 159).

*Caldwell v. Life Ins. Co. of North America*, 287 F.3d 1276, 1288 -1289 (10th Cir. 2002).

In the present case, Dr. Pradko's September 2nd letter indicates that he examined her on August 30, 2004, and she was experiencing nausea, dizziness and sedation from Oxycontin and was disabled from work at that time due to loss of mental function (R. 226). Dr. Audet found Plaintiff

20

similarly disabled in a September 11, 2004, letter (R. 227). Prior to these certifications of disability

due to narcotic use there is nothing in the record to indicate that Plaintiff could not work due to side

effects of the medications.   Plaintiff did complain to Dr. Pradko on July 29, 2004, the date she now

argues ST-D should have begun, that she was "emotionally and physically a wreck", Provera and

Vicodin were not relieving her excruciating pain and she could not concentrate on her work (R. 248).

On July 29th Dr. Pradko discontinued the Vicodin and Provera (R. 248) and apparently prescribed

Oxycontin (R. 224).[9]  Yet, when Dr. Pradko was contacted by Hartford on August 23, 2004, he did

not mention medication side effects as a disabling impairment and even refused to comment on

whether Plaintiff's physical impairment would be preclusive of work (R. 52). Therefore, there seems

to be no support in the record for disabling medication side effects beginning before August 30,

2004. Likewise, there is no support in the record for a finding that Plaintiff was not disabled due to

medication side effects after that time. Two treating physicians certified that they had examined her

and she could not work due to side effects of necessary medication. The consulting examiner did

not refute this evidence and did not examine Plaintiff himself to determine if it was true. Hartford

appears to argue that because Dr. Pradko said in his interview with Dr. Anderson, which took place

sometime before October 14, 2004, that Plaintiff could do "some work on a computer and speaking

on a phone" at her own pace, his September 2nd letter disabling her from work was negated. This

is too large an assumption, especially because Dr. Anderson does not indicate that Dr. Pradko

specifically stated that Plaintiff could perform her job or that he was taking back his previous

statement and the refuted statement regarding Plaintiff's ability to type her own disability paperwork

---

[9]The medical record does not indicate a prescription for Oxycontin, but Plaintiff indicates
in her appeal letter that it was prescribed on this date and Dr. Pradko's September 2nd letter
indicates that Plaintiff was taking Oxycontin.

21

was clearly part of Dr. Pradko's analysis, regardless of who made the statement.

Therefore, it is recommended that Plaintiff be awarded ST-D for August 30, 2004, through October 24, 2004.

### 3. ERISA non-disclosure claim

The argument in Plaintiff's motion is two-fold. First, Plaintiff argues that the summary plan description (SPD) she received in response to her request for such failed to meet ERISA disclosure requirements. Second, Plaintiff argues that she never received the full plan document(s) as requested. Defendants answer that Plaintiff was provided all the required plan documents and that they meet ERISA's disclosure requirements. Plaintiff requested the following relief: Publicis submit to all participants a SDP with all ERISA required information, statutory fees and attorney costs.

ERISA requires plan administrators to provide certain plan information upon written request:

(4) The administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated. The administrator may make a reasonable charge to cover the cost of furnishing such complete copies. The Secretary may by regulation prescribe the maximum amount which will constitute a reasonable charge under the preceding sentence.

29 U.S.C.A. § 1024 (b)(4).

A court has the discretion to impose a penalty of $110 per day for an administrator's failure to comply within 30 days of such a request. 29 U.S.C. §1132(c)(1) (authorizing $100 fine which was raised to $110 for violations after July 29, 1997, *see* 62 Fed. Reg. 40,696).

The Sixth Circuit has held that mere violations of procedural requirements of ERISA, such as incomplete summary plan descriptions, do not give rise to substantive remedies, the only remedy available being the $110 maximum per day per violation penalty. *Brown v. Ampco-Pittsburgh Corp.,*

22

876 F.2d 546, 550 (6th Cir. 1989); *Lewandowski v. Occidental Chemical Corp.*, 986 F.2d 1006, 1008

(6th Cir. 1993). Circuits have split on whether actual detrimental reliance on a SPD or simply

prejudice (i.e., the beneficiary was likely to be harmed by the error) or neither is required in order

to impose the penalty. *See Burke*, 336 F.3d at 112, 113 (holding after reviewing the positions of the

various Circuits that a prejudice standard served "ERISA's objective to protect employees against

inadequate SPDs").

 The Sixth Circuit, in *dicta*, has stated that neither detrimental reliance nor prejudice is

required, *Edwards,* 851 F.2d at 137 (6th Cir. 1988).[10]  Yet, imposition of the penalty remains

discretionary. *Bartling v. Fruehauf Corp.*, 29 F.3d 1062, 1068-1069 (6th Cir. 1994).

 Even if detrimental reliance and prejudice are not necessarily prerequisites to imposing the

---

[10]A later Southern District of Ohio opinion indicates that plaintiffs must show: "a
substantial lack of compliance with ERISA's reporting and disclosure requirements, with
resulting substantial harm to the employees, before a nondisclosure violation of §1021(a) is
subject to redress as arbitrary and capricious behavior. *See Blau v. Del Monte Corp.,* 748 F.2d
1348 (9th Cir.1984). Mere technical noncompliance with no showing of substantial harm or
egregious behavior on the part of the employer does not entitle plaintiffs to relief. *Simmons v.
Diamond Shamrock Corp.,* 844 F.2d 517 (8th Cir.1988)." *Rinard v. Eastern Co.* 769 F.Supp.
1416, 1429 (S.D. Ohio 1991) *rev on other grounds*, 978 F.2d 265 (6th Cir. 1992).

penalty;[11] detrimental reliance and prejudice remain factors in deciding the amount (if any) of civil penalties to assess under 29 U.S.C. § 1132(c). See, e.g., *Deboard v. Sunshine Mining & Ref. Co.*, 208 F.3d 1228, 1244 (10th Cir. 2000). The Sixth Circuit, reviewing a lower court's refusal to award civil penalties under §1132(c)(1)(B) stated that a refusal "to impose any penalty at all . . . absen[t] a showing of prejudice or bad faith" was not an abuse of discretion of the lower court. *Bartling v. Fruehauf Corp.*, 29 F.3d 1062, 1068-1069 (6th Cir. 1994) (holding that a penalty of $1.28 per document/per day was not too small an amount as to be an abuse of discretion by the lower court).

At the August 14, 2006, hearing on this matter Plaintiff's counsel explained that it is unknown when Plaintiff received a copy of the SPD – *Publicis Benefits Connection Health & Group Benefits Summary Plan Description 2004 Short-Term Disability Plan.*

On October 5, 2004, Plaintiff wrote a letter requesting "a copy of the plan description for short term disability . . . detailed information of the policy, and the criteria as to how it is determined whether an individual is to receive this benefit" (R. 174). On November 3, 2004, she received a

---

11

...neither prejudice nor bad faith are necessary to an assessment of statutory penalties. Not only is this analysis faithful to the language of the disclosure provisions and the underlying purposes of ERISA, but also it is in accord with the consensus of the Courts of Appeal. *See, e.g., Rodriguez-Abreu v. Chase Manhattan Bank*, 986 F.2d 580, 588 (1st Cir. 1993); *Faircloth v. Lundy Packing Co.*, 91 F.3d 648, 659 (4th Cir. 1996), cert. denied, 519 U.S. 1077, 136 L. Ed. 2d 677, 117 S. Ct. 738 (1997); *Godwin v. Sun Life Assurance Co. of Canada*, 980 F.2d 323, 327 (5th Cir. 1992) (discussing prejudice only); *Knickerbocker v. Ovako-Ajax, Inc.*, 187 F.3d 636, No. 98-1319, 1999 WL 551409, at *4 (6th Cir. 1999), cert. denied, 528 U.S. 1161 (2000); *Harsch v. Eisenberg*, 956 F.2d 651, 662 (7th Cir.) (prejudice only), cert. denied, 506 U.S. 818 (1992); *Kerr v. Charles F. Vatterott & Co.*, 184 F.3d 938, 948 (8th Cir. 1999); *Deboard v. Sunshine Mining & Ref. Co.*, 208 F.3d 1228, 1244 (10th Cir. 2000); *Daughtery v. Honeywell, Inc.*, 3 F.3d 1488, 1494 (11th Cir. 1993).

*Schelero v. Avis Rent a Car Sys.*, 2001 U.S. Dist. LEXIS 24682, 28-29 (D.N.Y. 2001).

24

letter purporting to enclose the "Short-Term Disability plan" (R. 57). At the August 14 hearing and in her motion for summary judgment Plaintiff alleges that this letter contained only "pages 1, 4, 5 and 6" of the Plan – *Publicis Groupe S.A. Short Term Disability Plan Summary* (Dkt. #19, p. 12). Defendants explained at the hearing that, although the employee that sent the document is no longer in its employ, if called she would testify that it was her business practice to send only complete documents. There is no evidence in the record to support either the contention that Plaintiff received only a partial document or the Defendants' business practices.

Plaintiff alleges that she sent another letter to Defendant Publicis on November 15, 2004, requesting "a copy of the plan for short term disability" and explaining that the SPD "posted on Mission Control is not the same document" she was requesting (Exhibit 1). This letter is not included in the administrative record, but is attached to this report and recommendation as a possible supplemental submission. Plaintiff alleges that she was orally informed that she had already received all the Plan documents.

Plaintiff argued in her complaint that Publicis sent her the SPD but it failed to meet ERISA reporting and disclosure requirements because the SDP did not contain all the provisions ERISA requires (Complaint, Dkt. #1, para. 30). In her Complaint she does not specify what provisions are missing. In her motion for summary judgment Plaintiff again agrees that she received the SDP, but states that it was defective because it "failed to contain all information required by ERISA" (Dkt. # 19, p.23). Plaintiff does not indicate to what provision(s) of ERISA she is referring or what information is missing. In Plaintiff's Reply Brief in support of her motion she indicates that Defendants failed to disclose: the identity of the ST-D Plan's fiduciary and the procedures for funding, allocating responsibility and amending the Plan (Dkt. #24 , p.4). All of these are required

25

provisions of a compliant plan, 29 U.S.C. Sec. 1102 (also referred to as ERISA sec. 402), but are

not all required to be included in the SPD, 29 U.S.C. 1022:

> The summary plan description shall contain the following information: The name and type of administration of the plan; . . . the name and address of the person designated as agent for the service of legal process, *if such person is not the administrator*; the name and address of the administrator; names, titles, and addresses of any trustee or trustees (if they are persons different from the administrator); . . . the plan's requirements respecting eligibility for participation and benefits; . . . circumstances which may result in disqualification, ineligibility, or denial or loss of benefits; the source of financing of the plan and the identity of any organization through which benefits are provided; the date of the end of the plan year and whether the records of the plan are kept on a calendar, policy, or fiscal year basis; the procedures to be followed in presenting claims for benefits under the plan including the office at the Department of Labor through which participants and beneficiaries may seek assistance or information regarding their rights under this chapter and the Health Insurance Portability and Accountability Act of 1996 with respect to health benefits that are offered through a group health plan (as defined in section 1191b(a)(1) of this title) and the remedies available under the plan for the redress of claims which are denied in whole or in part (including procedures required under section 1133 of this title).

29 U.S.C.A. §1022 (b).[12]

---

[12]In *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 83 (1995), the Court indicated that the basis of sec. 402 "is another of ERISA's core functional requirements, that '[e]very employee benefit plan shall be established and maintained pursuant to a written instrument.' 29 U.S.C. §1102(a)(1) (emphasis added). In the words of the key congressional report, '[a] written plan is to be required in order that every employee may, *on examining the plan documents,* determine exactly what his rights and obligations are under the plan." H.R.Rep. No. 93-1280, p. 297 (1974) U.S. Code Cong. & Admin. News pp. 4639, 5077, 5078 (emphasis added)" and noted that "ERISA gives effect to this 'written plan documents' scheme through a comprehensive set of 'reporting and disclosure' requirements, see 29 U.S.C. §§ 1021-1031, *of which §402(b)(3) is not part.* " *Id.* (Emphasis supplied where not internally indicated). The *Curtiss-Wright* Court went on to point out that plan administrators are required to "periodically furnish beneficiaries with a Summary Plan Description, see 29 U.S.C. § 1024(b)(1), the purpose being to communicate to beneficiaries the essential information about the plan" but that there are differences in the information that must be supplied to beneficiaries in an SDP and that which had to be included in a plan. *Id.* ("Not surprisingly, the information that every SPD must contain includes the 'name and address' of plan administrators and other plan fiduciaries, but not the names and addresses of those individuals with amendment authority. §1022(b)").

In Plaintiff's Response to Defendants' motion for summary judgement and at the August 14 hearing Plaintiff argued that the following items are impermissibly missing from the SDP: the name of the Plan, type of administration, name and address of the Plan Administrator, name and address of the agent for service of process, the date of the end of the Plan year and whether Plan records are kept on a calender, policy or fiscal year basis (Dkt. #23, p. 8).

### Items Required in Compliant SPD:

Name of Plan - two documents in the record are purported by Publicis to make up all the S-TD Plan documents – the *Publicis Benefits Connection Health & Group Benefits Summary Plan Description 2004 Short -Term Disability Plan* (R. 1) (referred to by Publicis as the SDP, Dkt. #18, p.5) and the *Publicis Groupe S.A. Short Term Disability Plan Summary* (R. 34) (referred to by Publicis as the Plan Document, Dkt. #18, p.5). There is no provision in either document explicitly stating the name of the S-TD Plan. The exact name of the Plan cannot be inferred from the SDP and Plan Document because it is referred to by two different names – the S-TD Plan of Publicis Benefits Connection Health & Group Benefits (R. 1) and the ST-D Plan of Publicis Groupe S.A. (R. 34).

Name and Address of the Plan Administrator – Defendants' allege that the Plan Administrator is Publicis Groupe's Publicis Benefits Connection (Dkt. # 18, p. 5). No where in either the Plan nor the SPD is this expressly stated, though it can be inferred from facts contained elsewhere in the SPD, such as the fact that participants are directed to call "the Benefits Department" if they need assistance regarding "the general plan, benefit or enrollment" (R. 5). Likewise, the address of the Plan Administrator is not provided.

Type of Administration – the SPD indicates that Hartford is the Claims Administrator and,

27

although the Plan Administrator has complete discretionary authority to make all determinations, it has delegated to Hartford the ability to make claims decisions (R. 23).  The SPD also indicates that participants can call the Benefits Department with general questions and should call Hartford for questions regarding offsets, coverage exclusions and limitations (R. 5)

Name and Address of the Agent for Service of Process – ERISA only requires that this information be provided if the person designated as agent for the service of legal process is not the administrator.  29 U.S.C.A. § 1022 (b).  In the present case the parties agree that Publicis accepts process on behalf of the Plan, but Plaintiff argues that this fact is required to be revealed in the SPD document.

Date of the End of the Plan Year and Whether Plan Records are Kept on a Calender, Policy or Fiscal Year Basis – At the August 14 hearing, Defendants conceded that, while the SPD indicates that benefits begin each January 1st (R. 4), it is true that it does not expressly indicate that the plan year ends on December 31st or on what term the Plan's records are kept.

*Items Required in Compliant Plan:*

Identity of the ST-D Plan's Fiduciary and the Procedures for Funding – it can be inferred from the description of the duties assigned to Publicis/"the Company" and Hartford in the SPD that these are the fiduciaries of the Plan.  Further, it is indicated that "the Company" pays the full cost of participation in the Plan (R. 8).

Allocating Responsibility – the SPD indicates that Hartford is the Claims Administrator and, although the Plan Administrator has complete discretionary authority to make all determinations, it has delegated to Hartford the ability to make claims decisions (R. 23).  The SPD also indicates that

28

participants can call the Benefits Department with general questions and should call Hartford for questions regarding offsets, coverage exclusions and limitations (R. 5)

Amending the Plan – the SPD indicates that "the *Company* . . . reserves the right to amend or terminate the plan at any time without notice" (R. 4) (emphasis in original). The United States Supreme Court has held that "a plan that says in effect it may be amended only by '[t]he Company' adequately sets forth a particular way of making an amendment. Principles of corporate law provide a ready-made set of rules for deciding who has authority to act on behalf of the company. But to read § 402(b)(3) as requiring a plan to specify on its face who has authority to act on the company's behalf might lead to the invalidation of myriad amendment procedures that no one would think would violate the statute". *Curtiss-Wright Corp., supra,* 514 U.S. at 73-74.

Therefore, it appears that the ST-D Plan documents do not technically comply with ERISA in that they do not expressly provide the name of the Plan, name and address of the Plan Administrator, end date for the Plan year and term in which Plan records are kept.

At the August 14 hearing Plaintiff's counsel conceded that Plaintiff was not financially damaged due to these or any of the alleged omissions. Plaintiff's counsel added that Plaintiff could have been prejudiced in deciding whether or not to pursue litigation without the benefit of a compliant Plan document, but admits that it is unlikely that the result would have been different. Therefore, it appears that the only damages at issue are the $110 per day fines allowed by ERISA.

Because Plaintiff was not prejudiced by the omissions and there is not sufficient evidence in the record or the supplemental letter to indicate that Defendants omitted the information in bad faith and because there was an honest dispute as to whether the documents were compliant, the

29

undersigned recommends that Defendant Publicis be ordered to revise the Plan for compliance, distribute the revised Plan to its participants in the normal course required by ERISA when Plan changes are made and pay minimal damages to Plaintiff of $380, which represents $10 per day from November 15 when Plaintiff arguably notified Defendant Publicis that she felt the documents she had received thus far were inadequate and December 23, 2004, when Plaintiff filed this lawsuit.

## II.   RECOMMENDATION

Therefore, for the reasons stated above, IT IS RECOMMENDED that the Defendants' Motion (Dkt. #18 ) be DENIED and Plaintiff's Motion (Dkt. #19) be GRANTED IN PART AND DENIED IN PART with the following result: Plaintiff be awarded ST-D for August 30, 2004, through October 24, 2004, and $380 in statutory fees.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local*, 231, 829 F.2d 1370,1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless

by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: August 18, 2006                      s/Steven D. Pepe
Ann Arbor, Michigan                         United States Magistrate Judge

### Certificate of Service

I hereby certify that a copy of this Order was served upon the attorneys and or parties of record by electronic means and/or U. S. Mail, on August 18, 2006.

Dated: August 18, 2006                      s/Deadrea Eldridge
                                            Courtroom Deputy Clerk

31

Cari Ann Hamilton
22512 Mylls
St. Clair Shores, MI 48081
586-285-1343

**Exhibit**

**1**

November 15, 2004


Publicis Groupe Benefits
35 W. Wackier Dr.
Chicago, IL 60601
Attn: Dawn Kalamaras


Dear Dawn:

I am requesting a copy of the plan for short term disability. The summary plan description for short term disability that is posted on Mission Control is not the same document as what I am requesting.

I would appreciate it if this could be sent to my home address.

Thank you for your cooperation.


Cari Ann Hamilton